IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

SAGE REDWIND,                                                  Civ. No. 3:14-cv-01699-AC

          Plaintiff,                                    FINDINGS & RECOMMENDATIONS

      v.

WESTERN UNION, LLC,

          Defendants.

_____

ACOSTA, Magistrate Judge:

      Plaintiff Sage Redwind ("Redwind") filed this lawsuit against her employer, Western Union, LLC ("Western Union") for defamation, discrimination, harassment, retaliation, and discriminatory pay practices. After a lengthy discovery period, Western Union now files for summary judgment (ECF No. 95) and argues no reasonable jury could find in Redwind's favor. After careful review of the record, the court concludes Western Union is entitled to summary judgment on each of Redwind's claims.

*Factual Background*

In February 2008, Western Union hired Redwind as a territory manager in the inner-mountain corridor region. (Decl. of Carla Anthony in Supp. Of Def.'s Mot. for S.J. ("Anthony Decl.") ¶ 5.) Her starting salary was $40,000. (*Id.*) Eventually, her job title was changed to "Account Executive MT." (*Id.* ¶ 8; Am. Decl. Of Amanda Bollinger Crespo in Supp. for Def.'s Mot. For S.J. ("Crespo Decl") Ex. 1 ("Redwind Decl.) at 27:11-28:9.)

As part of the hiring process, Redwind signed an offer letter and an employment agreement (Anthony Decl. Ex 5; Decl. of Sage Redwind in Supp. of Pl.'s Resp. in Opposition to Def.'s Mot. for S.J. ("Redwind Decl.") Ex. 38.) By signing the employment agreement, Redwind affirmed that she had received a copy of the Western Union Code of Conduct (the "Code of Conduct") and that she agreed "to abide by the terms outlined in that document." (Anthony Decl. Ex. 5 at 2.) She also agreed to relinquish any interest she had in intellectual property created during her tenure with Western Union. (*Id.* at 1.) The "Ownership and Assignment of Intellectual Property" portion of the employment agreement reads as follows:

> By signing below, I hereby assign and agree to assign, free of any obligation whatsoever, to the Company as well as its or their successors, assigns, or nominees, my entire right, title, and interest in any developments, designs, patents, inventions and improvements, trade secrets, trademarks, service marks, corporate names, domain names, copyrightable subject matter (collectively, "Intellectual Property"), or proprietary information which I have made, or may make, in whole or in part, and either solely or jointly with others, while I am employed by the Company and/or with the use of the time, material or facilities of the Company, and/or resulting from any tasks assigned to me or work performed by me or on behalf of the Company

(*Id.*)

Redwind has been a consistently good employee. She has received a raise each year she has worked for Western Union, including 2015, when her current manager, Craig Pinnegar ("Pinnegar") requested that her base salary be increased to $51,768. (Anthony Decl. ¶ 15.) Redwind is also eligible to earn up to $20,000 per year in merit-pay incentives. (*Id*.) Due to her performance and merit-pay increases, which are usually among the highest of all Account Executive MTs in her region, Redwind is the third highest-paid Account Executive MT. (*Id*. ¶ 18.) Only two Account Executive MTs, Charles Dalmadge and Scott Jepperson, have a higher base salary than Redwind, but both Charles and Dalmadge, at thirty-four and fourteen years with Western Union respectively, have significantly more seniority than Redwind. (*Id*.)

As a result of Redwind's high performance, she has consistently been rated highly in performance reviews. Since 2011, when Pinnegar became her manager, she has repeatedly received year-end performance ratings of "exceeds expectations." (Decl. of Craig Pinnegar in Supp. of Def.'s Mot. for S.J. ("Pinnegar Decl.") ¶ 9.) Pinnegar gave Redwind a three on a four-point scale for her 2011 year-end performance review. (*Id*.) Shortly thereafter, Western Union adopted a five-point rating scale, with five being the highest. (*Id*. ¶ 13.) Under the new scale, Redwind has received an overall rating of four-out-of-five each year. (*Id*. ¶¶ 13, 25, 33.) Pinnegar has "never given any Account Executive MT a higher overall rating than 'Exceeds Expectations.'" (Pinnegar Decl. ¶ 8.) Redwind was also awarded merit increases during each year-end performance review. (*Id*.) In 2011 and 2013, Redwind was awarded a merit increase of 4%. (*Id*. ¶¶ 9, 25.) She was given an increase of 4.5% in 2012 and 2014. (*Id*. ¶¶ 13, 33.) In 2011, 2013, and 2014, Redwind was given the highest merit increases of any Account Executive MT in her region. (*Id*. ¶¶ 9, 13, 25, 33.)

In November 2012, Pinnegar traveled to Portland and Seattle to meet with his subordinates in those cities. (Pinnegar Decl. ¶ 12.) He invited Redwind and two of her colleagues to have lunch in the Portland area, but one of Redwind's co-workers was unable to attend. (*Id*.) After the meeting concluded, Pinnegar drove to Seattle to meet with four other Account Executive MTs under Pinnegar's supervision in Tukwilia, Washington. (*Id*.) He chose to meet with those four subordinates because two lived in Idaho and Spokane, Washington, so they would have had to travel regardless of where the meeting was held. (*Id*.) Redwind asserted that Pinnegar had "excluded" her from the Tukwilia meeting for discriminatory reasons. (Third Amended Complaint ("TAC") at 8.)

In August 2012, Western Union Manager Judy Chen ("Chen") was visiting the Portland area to work on recruitment strategies. (Redwind Depo. 115:5-19.) Redwind drove Chen to various locations in the Portland area to show her the area and highlight business districts for potential expansion. (*Id*.) At one point during the drive, Chen told Redwind, "you don't act Indian." (*Id*. at 113:19-21.) Later, Chen made comments about Redwind's nose, asking Redwind "where do you find glasses that fit your nose?" (*Id*. at 113:22-25.) Chen also asked Redwind whether the bump on her nose interfered with her breathing, and whether the bump on her nose causes her glasses to slide off. (*Id*. at 114:1-7.)

On February 19, 2013, Chen made a posting on a Salesforce.com ("Salesforce"), a business-centric social media website on which Western Union employees frequently communicated. (Decl. of Randall Acocelli in Supp. of Def.'s Mot. for S.J. ("Acocelli Decl.") Ex. 8.) The posting thanked two of Redwind's colleagues, Stacy Blake and Wendle Raping ("Raping"), for their hard work and praised them for "outstanding teamwork with Seattle [C]hinese recruitment." (*Id*.) Redwind responded to the post requesting "empirical statistics" to support Chen's praise and explained, "I find that when praise is given

on [a] nationwide scale like this, I am very inquisitive and cautious of the [i]mage that this new praise

creates within the mental framework of the upper management that does not get to work in the fields in

which praise is being distributed." (*Id.*) Redwind then made a second posting which included the following:

> Consider the effect of hypothetical syllogism, if A is to B, and will consider A your praise
> and B being that which you praise, and B is to C, C being the work ethics and/or outcome
> of appraisal, then as the audience member or SAM the natural problem of this logic is that
> upper management and those with no direct empirical knowledge of the situation will
> naturally assume A in relation to C, in other words, they see your praise (A as filling in the
> gaps of actual and true empirical evidence) and due to the nature of logic, they assume C
> which would be the outcome of the desired praise, (which may or may not be accurately
> distributed).

(*Id.*) Raping took issue with Redwind's comments and replied to Redwind, "[i]f I am reading your

comments correctly, are u [*sic*] trying to imply that [Judy Chen's] praise of []Stacy Blake and I [*sic*] are

unwarranted?" (*Id.*) Thereafter, Redwind posted four more times to the thread in which she explained she

was trying to "remedy a disservice." (*Id.* at 2.) Raping reported the incident to Pinnegar via email on

February 21, writing "Is all this really necessary? I am truly at a [loss] for words here." (Pinnegar Decl.

Ex. 3 at 1.)

In early 2013, Pinnegar completed Redwind's 2012 year-end performance review, giving Redwind

a rating of four-out-of-five or "exceeds expectations." (Pinnegar Decl. ¶ 16.) Redwind met with Pinnegar

on March 5, 2013 to discuss the review. (*Id.*) After Redwind asked Pinnegar how she could receive a

higher grade, Pinnegar "identified some opportunities for growth for Ms. Redwind . . . ." (*Id.*) Pinnegar

told Redwind that she seemed to be "clashing" with one of her co-workers after Redwind accused the co-

worker of being "negligent." Pinnegar also explained that the way Redwind spoke about her coworkers

was perceived by some to be "condescending, abrupt, and short." (*Id.* ¶ 16(a)) (internal quotation marks

omitted.) Pinnegar also critiqued Redwind's professional judgment by citing Redwind's response to Chen's Salesforce posting. (*Id*. ¶ 16(b).)

Redwind took offense to Pinnegar's criticisms and emailed supervisor, Randy Acocelli ("Acocelli") to object. (Decl. of Marcus McCarty in Supp. of Def.'s Mot. For S.J. ("McCarty Decl.") Ex. 1 at 2.) Acocelli largely agreed with Pinnegar's analysis, and told Redwind that she was not deserving of a five-out-of-five rating, as those ratings go only to people who far exceed expectations who the company cannot afford to lose. (*Id*.) Redwind also took offense to Acocelli's comments, which she described as "discriminatory." (*Id*.)

On March 9, 2013, Redwind filed a complaint with the Western Union ethics department about Pinnegar's and Acocelli's "discriminatory" statements and conduct (the "First Ethics Complaint"). (McCarty Decl. ¶ 4; Ex. 1.) Human Resources Representative Sheryl Eagle ("Eagle") was assigned to investigate the complaint. (McCarty Decl. ¶ 5.) Eagle interviewed Redwind, Pinnegar, and Acocelli regarding Redwind's complaints, and conducted follow-up interviews of Redwind and Acocelli. (McCarty Decl. Ex 2 at 4; Acocelli Decl. ¶ 5.) Following the investigation, Eagle concluded Pinnegar was "not discriminating, marginalizing, or attacking [Redwind's] character." (McCarty Decl. Ex. 2 at 10.) However, Eagle recommended Pinnegar receive coaching on his communication and awareness. (*Id*.)

In July 2013, Western Union finalized plans to hold a sales training in Miami, Florida, for "high achieving" Western union employees. (Acocelli Decl. Ex. 3.) Acocelli recommended Redwind for the training due to her consistent positive performance, and on July 26, 2013, Western Union extended Redwind an invitation to attend the training. (*Id*. 3.) Redwind declined the invitation because she was "under the impression that training is geared toward those who need[] [to be] more efficient in a given

subject," and that the training "would be better suited for the members of our team who need assistance

in developing such skills." (*Id.*) Pinnegar assured Redwind that the training was for "high achievers," and

asked Redwind whether she believed she had "reached the point where [her] skills cannot be improved?"

(*Id.* at 2-3.) Redwind responded to Pinnegar, saying that "there is always room for improvement," but the

literature for the training program described the training as targeted at "new and experienced salespeople

who "**need**" to improve their approach and interpersonal skills." (*Id.* at 2) (emphasis original.) Redwind

believed she did not "need" improvement in these areas and declined the invitation. (*Id.*)

Around the same time, Pinnegar awarded Redwind's colleague Stephanie Watts ("Watts") an

Outstanding Achievement Award, which he awarded to Redwind the previous year. (Pinnegar Decl. ¶ 21.)

He based his decision on Watts's high sales performance in the short time she had been with the company.

(*Id.*) Redwind thought she should have received the award and asked Pinnegar and Acocelli why she was

not recognized for her work. (*Id.*) Redwind was not satisfied with their answers, and emailed Acocelli's

supervisor Carter Hunt to raise her concerns about how the recipient of the Outstanding Achievement

Award was chosen. (Acocelli Decl. Ex 4.)

Acocelli became concerned that Redwind's "public method of questioning praise given to others

detracted from her otherwise good performance and undermined her position on her team . . . ." (Acocelli

Decl. ¶ 9.) To share his concerns with Redwind, Acocelli prepared a memorandum explaining to Redwind

how she could improve her performance and team work (the "Coaching Memorandum"). (*Id.*) Through

the Coaching Memorandum, Acocelli explained to Redwind that some of her actions showed poor

professional judgment and ineffective interpersonal skills. (*Id.*) Specifically, Acocelli raised five incidents

which highlighted his point: (1) Redwind's post on Salesforce questioning why Chen would give praise to

Redwind's colleagues; (2) Redwind's performance review self-assessment, in which Redwind rated herself a perfect 5 out of 5 and made several comments which detracted from the performance of her co-workers and managers; (3) Redwind's mid-year performance review, in which she made disparaging comments about Pinnegar; (4) Redwind's decision to decline the training in Miami; and (5) Redwind's decision to email Carter Hunt about not receiving the Outstanding Achievement Award. (*Id*.) Acocelli concluded that he was concerned that Redwind "showed a real lack of tack[sic] and blatant disrespect for the leaders directly in your management chain as well as peers and others in the [Western Union] organization." (*Id*. at 4.)

Shortly after receiving the Coaching Memorandum, Redwind filed an ethics complaint against Acocelli and Pinnegar for defamation and discrimination. (McCarty Decl. Ex. 3.) In particular, Redwind complained that Pinnegar awarded Watts the Outstanding Achievement Award based on an "unfair advantage" and that Acocelli "pretended to council and coach" her by giving her the Coaching Memorandum, but intended only to "defame [her] character and attac[k] [her] person with more aggression than last time." (*Id*. at 1-2.) The ethics department assigned Director of Employee Relations Sharon King ("King") to investigate the complaint and follow up with Redwind about her concerns. (McCarty Decl. ¶ 8.) King and Redwind exchanged several emails about the ethics complaint. (McCarty Decl. Ex. 3 at 2-5.) In one, Redwind assailed Acocelli's decision to give her the Coaching Memorandum based on her Salesforce posts to Chen, writing "I was potentially being discriminated on multiple fronts and when I saw that Judy Chen had decided to praise a few selected individuals with the team for the same work that many individuals had accomplished, I immediately recognized another type of discrimination, based upon favoritism . . . ." (*Id*.) However, Redwind did not inform King about the August 2012 incident where

Chen made racially derogatory statements. (*Id*.) King concluded Pinnegar and Acocelli violated no laws or Western Union policies, and decided to close the complaint. (*Id*. at 5-6.)

After receiving King's decision, Redwind sent a message to Marcus McCarty ("McCarty"), Western Union's Assistant General Counsel of Corporate Ethics and Compliance Office, alleging that King conducted an inadequate investigation of her first and second ethics complaints. (McCarty Decl. ¶ 9.) In response McCarty reviewed the materials produced during those investigations and conducted follow-up interviews with Redwind, Pinnegar, and Acocelli. (*Id*. ¶ 10.) Ultimately, McCarty agreed with King and concluded that the information provided to the ethics office did not support a finding that any Western Union policy was violated. (*Id*. ¶ 11.)

In October 2013, Redwind discovered a document on a Western Union employee website which she believed to represent the Western Union pay scale. (Pinnegar Decl. Ex. 2.) Based on the document, Redwind believed she was being paid below what was required for her position. (*Id*.) She immediately emailed Pinnegar to raise the issue. (*Id*.) Pinnegar referred the matter to the human resources department, who investigated the issue and produced a separate "pay scale" which contradicted Redwind's claims of being under-compensated. (Anthony Decl. Ex. 2-3.) This response did not resolve Redwind's complaint, however.

In February 2014, Pinnegar gave Redwind her 2013 year-end performance review. (Pinnegar Decl. Ex. 4.) Pinnegar gave Redwind an overall rating of "exceeds expectations" or four out of five. (*Id*.) Redwind was not pleased with her evaluation, and emailed Diana Martinez ("Martinez"), a senior human resources executive, to appeal Pinnegar's decision and request "measurable data" to support Pinnegar's evaluation. (Pinnegar Decl. Ex. 5.) Martinez responded to Redwind, stating, "based on my assessment,

I have determined that . . . the evaluation of your performance for 2013 was appropriate and does not warrant change.  (*Id*. at 1.)

Redwind was similarly displeased with her 2014 mid-year performance review.  (McCarty Decl. Ex. 8 at 1.)  Notably, Redwind was offended by Pinnegar's critique that Redwind could improve on her "communication[] and interpersonal interactions with management and . . . colleagues, which have been strained at times due to her failure to engage in a respectful and productive manner."  (*Id*.)  These criticisms were conveyed to Redwind during a conference call with Pinnegar, Martinez, and Redwind.  (*Id*. at 1.)  Due to her dissatisfaction with this evaluation, Redwind filed an ethics complaint against Pinnegar and Martinez for slander and retaliation.  (McCarty Decl. Ex. 7 at 1.)  McCarty investigated the complaint by reviewing the documents Redwind submitted and interviewing Pinnegar, Martinez, and Redwind. (McCarty Decl. ¶ 15.)  Ultimately, McCarty agreed with Martinez that Pinnegar's evaluations were accurate, and emailed Redwind to inform her that he identified no violations of policy or law.  (*Id*.)

In March 2014, Redwind filed a charge against Western Union with the Oregon Bureau of Labor and Industries ("BOLI") for discrimination on the basis of race, national origin, and sex, and for creating a hostile work environment.  (Crespo Decl. Ex. 6.)  Redwind raised twelve grievances regarding the allegedly discriminatory conduct.  (*Id*.)  BOLI investigated Redwind's charge but did not find sufficient evidence to continue the investigation, and issued Redwind a "right to sue" letter on September 3, 2014. (Compl. Ex. 1 at 8.)

In August 2014, Luis Felipe Rodriguez Vega ("Vega"), Western Union's Vice President of U.S. Commercial Sales, discovered one of Redwind's postings on Salesforce which he believed violated Western Union policies.  (Decl. Of Luis Felipe Rodriguez Vega in Supp. Of Def.'s Mot. For S.J. ("Vega

Decl.") ¶ 5.) The post caught Vega's attention because it concluded "Copyright 2014, Sage Redwind" in violation of Western Union's intellectual property policy. (*Id*. ¶ 6.) Vega also observed that the post contained language about "eliminating" competition, adopting "hidden position[s]," and hindering the competition's strategy, which Vega thought violated Western Union's antitrust policies. (*Id*. at ¶¶ 6-8.) Vega explained his concerns to a subordinate manager with the directive to "ensure his concerns were addressed with Ms. Redwind." (*Id*. at ¶ 10.) Vega's directive was conveyed to Pinnegar, who worked with human resources to draft a warning to Redwind about her violations of Western Union policy (the "Warning"). (Pinnegar Decl. ¶ 29.) Pinnegar and Martinez gave Redwind the Warning on October 1, 2014. (Pinnegar Decl. Ex. 7.)

The same day Pinnegar issued Redwind the Warning, Redwind filed a fourth ethics complaint against Pinnegar and Martinez for discrimination, retaliation, and defamation based on their decision to issue the Warning. (McCarty Decl. Ex. 10.) She argued the Warning violated Title VII and Western Union policies because it was "false" and "unwarranted," and that it was issued in retaliation for her BOLI complaint. (*Id*. at 2.) McCarty began investigating the complaint, and interviewed Redwind on several occasions. (McCarty Decl. ¶ 18.) However, Redwind had filed this lawsuit prior to the interviews, and declined to answer several of McCarty's questions on the basis of "work product," including questions about why she believed the Warning constituted discrimination based on her race, national origin, and gender. (Dkt. No. 1; McCarty Decl. ¶ 18.) Ultimately, McCarty concluded that Redwind's Salesforce postings violated Western Union policy, and the evidence did not support Redwind's contention that the Warning was issued for a retaliatory or discriminatory purpose. (McCarty Decl. ¶ 22.) On that basis, McCarty closed Redwind's fourth ethics complaint on March 27, 2015. (*Id*.)

On April 22, 2015, Redwind filed a fifth complaint with the Western Union ethics department against Anthony, McCarty, and Western Union Human Resources Director Julia Jacobs ("Jacobs") for harassment, retaliation, and "increased surveillance." (McCarty Decl. Ex. 14.) In the fifth complaint, Redwind alleges that Anthony, McCarty, and Jacobs were negligent in their investigations of her previous ethics complaints and closed the cases without just cause for retaliatory reasons. (*Id.* at 2-3.) The ethics office suspended its investigation of Redwind's complaint pursuant to an order of this court on May 1, 2015, but reopened the case pursuant to a subsequent order on July 2, 2015. (McCarty Decl. ¶ 25.) Eventually, Western Union recused itself from the investigation and referred it to an outside investigator because it is lodged against heads of the ethics and human resources departments.

*Legal Standard*

A court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).   The moving party bears the burden of establishing that no issue of fact exists and that the nonmovant cannot prove one or more essential elements of a claim or defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  If the movant meets his burden, the nonmovant must "go beyond the pleadings [ ] by her own affidavits . . . [to] designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks omitted).  Conclusory allegations which are unsupported by factual material such as affidavits and documentary evidence are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  On summary judgment, the court is bound to view all facts in a light most favorable to the nonmovant and must draw all justifiable inferences in the nonmovant's favor. *Narayan v. EGI, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010).

*Discussion*

Redwind's complaint alleges claims for defamation, pay discrimination, harassment discrimination, and retaliation. Western Union moves for summary judgment against each claim, and contends no reasonable jury could find in Redwind's favor based on the record now before the court. Western Union is correct on each count, and the court concludes Western Union is entitled to summary judgment.

I.  Defamation.

Redwind alleges defamation based on statements made by Western Union managers and employees. Western Union moves for summary judgment on Redwind's defamation claim. It argues Redwind failed to adequately plead her defamation claim with specificity. Moreover, Western Union contends the statements at issue in this case are privileged under Oregon law and may not serve as a basis for a defamation claim. Finally, they argue the allegedly defamatory statements are opinions which are not actionable under a defamation claim.

For a defamation claim to survive summary judgment, the plaintiff must produce enough evidence to allow a reasonable jury to find: (1) the making of a defamatory statement; (2) the 'publication' of the defamatory material; and (2) a resulting special harm, unless the defamatory statement gives rise to presumptive special harm. *Mannex Corp v. Bruns*, 250 Or. App. 50, 57-58 (2012). A statement is defamatory if it "subjects a person to hatred, contempt or ridicule or tends to diminish the esteem, respect, goodwill or confidence in which she is held or excited adverse, derogatory or unpleasant feelings or opinions against her. *Worley v. Ore Physicians Serv.*, 69 Or. App. 241, 244 (1984). Whether a statement is capable of "capable of a defamatory meaning" is a decision for the court. *Id*. Moreover, when pleading a defamation claim, courts generally require the plaintiff to specifically identify the defamatory

statements at issue and to plead those statements verbatim. *Volvo N. Am. Corp v. Men's Int'l Pro. Tennis Council*, 678 F. Supp. 1035, 1046 (S. D. N.Y. 1987) (cited favorably by *Rice v. Comtek Mfg. Of Ore, Inc.*, 766 F. Supp. 1539, 1541 (D. Or. 1990)).

Here, Redwind meets her burden of pleading specific statements. Redwind alleges in the Third Amended Complaint that Pinnegar, Acocelli, and other Western Union employees stated that she exhibited "poor judgment" and that she had "interpersonal skill problems," "interaction problems" and was "too competitive," that she was "not a team player," and that she showed "a lack of team spirit." (TAC at 7, 9, 16.) Finally, Redwind alleges Pinnegar told her she showed "a real lack of tact and blatant disrespect for the leaders directly in her management chain as well as peers and others in Western union." (*Id*. at 19.) Redwind alleges each of these statements as a quotation, and clearly alleges the declarant in each instance. Redwind has met her burden of pleading with specificity.

However, the court concludes Redwind's claims fail as a matter of law because each of these statements was privileged, even if a reasonable person could find one or more of these statements capable of defamatory meaning. First, any and all statements by Western Union managers and employees are subject to a qualified privilege. A defamatory statement is subject to a qualified privilege if: "(1) it was made to protect the defendant's interests; (2) it was made to protect the interests of the plaintiff's employer; or (3) it was on a subject of mutual concern to the defendant and the persons to whom the statement was made." *Mannex Corp*., 250 Or. App. at 59 (citing *Wallulis v. Dymowski*, 323 Or. 337, 350 (1996)). Courts afford wide latitude to statements by managers and co-workers about an employee's work performance. *See Mannex Corp*, 250 Or. at 60 (discussing work-related statements). "A defamatory work-related statement . . . concerning another employee's work performance falls into either the second

or third category" of statements to which the conditional privilege applies. *Id.* (quoting *Wallulis*, 323 Or. at 350-51). At least one court has determined that promoting "workplace harmony" is within the interests of an employer, the employer's manager, and other employees. *Id.*

Here, each statement about Redwind uttered by Pinnegar, Acocelli, Hunt, McCarty, and any other Western Union employee is subject to the qualified privilege, as each was on a subject of concern for Western Union and its employees. Specifically, the comments of Western Union employees about how Redwind's personality and communication skills affect morale and business efficiency are on a matter of concern for Western Union, which has an interest in promoting workplace harmony and employee efficiency. All of the statements of which Redwind complains are related to her work and the work of Western Union. Therefore, these statements are subject to the conditional privilege.

Redwind argues that Western Union lost the qualified privilege through abuse. A declarant may lose the qualified privilege if he or she has an improper purpose for publishing the defamatory statements:

> A qualified privilege may be lost if: (1) the publisher does not believe that the statement is true or lacks reasonable grounds to believe that the statement is true; (2) if the statement is published for a purpose other than that for which the particular privilege was given; (3) if the statement is published to someone not reasonably believed to be necessary to accomplish the purpose; or (4) if the publication involves defamatory information not reasonably believed to be necessary to accomplish the purpose.

*Wilson v. Dollar Tree Stores, Inc.*, No. Civ. 03-817-HA, 2004 WL 1381209, at *3 (D. Or. June 21, 2004) (citing *Shafroth v. Baker*, 276 Or. 39, 45 (1976). Here, Redwind offers no evidence to create a genuine issue of material fact on whether Western Union abused the qualified privilege. Redwind cites no documentary evidence to show that any of the four factors apply. Instead, she cites to ten paragraphs in the Redwind Declaration. However, none of these paragraphs contains admissible evidence which shows

abuse of the qualified privilege against defamation. They primarily consist of Redwind's inadmissible argumentative and conclusory testimony about the declarants. To the extent Redwind argues Western Union and the declarants acted with the improper purpose of discrimination and retaliation, Redwind produces nothing in support of her argument besides speculation and conjecture. This is not enough to defeat a motion for summary judgment.

Accordingly, Redwind fails to meet her burden of demonstrating abuse of the qualified privilege. Because Redwind failed to establish abuse, Western Union is entitled to the qualified privilege against defamation for the statements at issue in this case, and summary judgment should be granted in Western Union's favor. Because the court concludes each statement at issue is entitled to the qualified privilege, the court need not address Western Union's arguments that the statements are non-actionable opinion and that some of the statements at issue are entitled to absolute immunity as statements in a quasai-judicial proceeding.

II. Pay Discrimination.

Redwind alleges that she has been subject to pay discrimination on the basis of her race and her gender, and alleges claims under the Equal Pay Act and 42 U.S.C. § 1981. Western Union moves for summary judgment and argues Redwind cannot prove a prima facie case under either statute. Redwind's argument relies primarily on a two-page document filed separately from her Response which she contends is "proof" of discrimination. The court will first discuss whether her Equal Pay Act ("EPA") claim survives summary judgment, and thereafter address her claim for discriminatory pay practices under § 1981.

A. Equal Pay Act.

The principle underlying the EPA is "that employees doing equal work should be paid equal wages, regardless of sex." *EEOC v. Maricopa Cty. Cmty. Coll. Dist.*, 736 F.2d 510 (1984) (quoting *Hein v. Ore Coll. of Educ.*, 718 F.2d 910, 913 (9th Cir. 1983)). For a plaintiff to prove a claim under the EPA, he or she must show "that the employer pays different wages to employees of the opposite sex for substantially equal work." *Maricopa Cty. Comm. Coll Dist*, 736 F.2d at 513. The plaintiff has the burden of demonstrating the comparator jobs are "substantially equal." *Id*. "To be 'substantially equal,' the jobs need not be identical, but must require similar skills, effort and responsibility performed under similar conditions; it is actual job performance requirements, rather than job classifications or titles, that is determinative." *Id*. Once the plaintiff makes a sufficient showing of a *prima facie* case, the burden shifts to the defendant to demonstrate the pay-differential is not the result of discrimination. *Id*. The EPA provides four statutory exceptions upon which the defendant may rely: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1).

Here, Redwind does not prove a prima facie case under the EPA. First, she does not produce evidence that another similarly situated individual has been paid more than she. In fact, Redwind does not even state her salary in relevant portions of the response brief. Nor does she include her salary in the "Pay Discrimination Attachment." Instead, she relies exclusively on her argument that Western Union employees and managers gave her false information about the applicable wage structure and committed "fraud." Redwind produces no authority to support her argument that a disagreement about the applicable pay structure is sufficient to constitute a *prima facie* case under the EPA.

Western Union concedes that two similarly-situated male employees earn more than Redwind: Charles Dalmadge and Scott Jepperson. However, these two employees have been employed by Western Union for much longer than Redwind and have seniority over her. Charles Dalmadge has been with Western Union for thirty-four years, and Scott Jepperson for fourteen years. Redwind has worked for Western Union for only seven years, so the pay differential is explained by each individual's relative seniority, and Redwind provides no evidence that these employees' pay is based on some other, improper factor. Therefore, to the extent Redwind can prove a *prima facie* case under the EPA with respect to Dalmadge and Jepperson, Western Union has met its burden of showing a non-discriminatory reason for the pay differential. Thus, the court should grant Western Union summary judgment on Redwind's EPA claim.

    *B. Racially Discriminatory Pay Practices.*

The standard for establishing a *prima facie* case of employment discrimination under § 1981 is the same used to establish a *prima facie* case of disparate treatment under Title VII of the Civil Rights Act of 1964. *Gay v. Waiters' & Dairy Lunchmen's Union Local No. 30*, 694 F.2d 531, 539 (9th Cir. 1982). Under Title VII a plaintiff may establish a *prima facie* case of discrimination either through direct evidence or circumstantial evidence. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998). Direct evidence is "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the *fact finder* to infer that the attitude was more likely than not a motivating factor in the employer's decision." *Enlow v. Salem-Keizer Yellow Cab Co., Inc.*, 389 F.3 802, 812 (9th Cir. 2004) (emphasis original).

Where no direct evidence is apparent on the record, the plaintiff may still establish a *prima facie* case of disparate treatment through circumstantial evidence by showing: (1) she belongs to a protected class; (2) she was qualified for a job or was performing according to her employer's legitimate expectations; (3) she was subject to lower pay than similarly situated individuals not in her protected class. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008). Where the plaintiff meets this burden, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the employer's action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Davis*, 520 F.3d at 1089. If the employer does so, the plaintiff must demonstrate that the "reason is pretextual 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing the employer's proffered explanation is unworthy of credence.'" *Davis*, 520 F.3d at 1089 (quoting *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1123-24 (9th Cir. 2000)).

Here, Redwind bases her pay discrimination claim entirely on her contention that the Western Union Human Resources Department lied to her about the applicable pay scale, despite that all of her coworkers were being paid pursuant to the pay scale Western Union represented as being "correct." Therefore, her § 1981 claim fails as a matter of law. Even if Redwind had made her *prima facie* case by demonstrating that similarly-situated non-Indian employees were paid more than she was paid, Western Union can demonstrate a legitimate, nondiscriminatory reason behind the pay differential: seniority. Redwind does not argue her evidence demonstrates pretext, and even if the court construed her to argue pretext, the evidence she cites in support for her position either does not support her contention or is inadmissible pursuant to the court's rulings on the parties' evidentiary objections.

To the extent Redwind argues that the "pay scale" she found on a Western Union employee database creates a genuine issue of material fact on pretext, the court disagrees. Western Union has produced testimony by Western Union Human Resource managers that the pay scale Redwind claims is applicable to her position is applicable to non-sales positions in Western Union. (Anthony Decl. ¶ 12.) Because Redwind's position is a "sales" position, the pay scale is irrelevant to measure the propriety of Redwind's salary. That human resources manager also testifies that the "2013 Pay Scale," which appears as Exhibit 2 to the Anthony Declaration, is the correct scale. Redwind produces no testimony or other evidence, besides her own conjecture and speculation, to rebut this testimony or otherwise create a genuine issue of material fact. Accordingly, the court should grant Western Union summary judgment on Redwind's claims for unequal pay under the EPA and § 1981.

III. Title VII Claims.

Redwind raises claims for discrimination under Title VII with respect to her race and gender. First, she contends Western Union created a hostile work environment based on gender and race. Second she argues she was subject to disparate treatment based on her race and gender. Western Union argues Redwind's claims are untimely and, in the alternative, she fails to meet her burden of showing harassment or disparate treatment.

    *A. Harassment Claims*.

Although she does not articulate a claim for "harassment" as one of claims for relief, Redwind's Third Amended Complaint contains several allegations that she suffered "harassment." Western Union moves for summary judgment on Redwind's harassment claim, should the court choose to construe her complaint as alleging one. Western Union makes two arguments. First, it contends Redwind's claim is

time-barred to the extent she intends to rely on statements and conduct which occurred prior to May 19,

2013, for her federal claim and prior to March 15, 2013, for her Oregon state claim. Western Union also

argues that the statements and conduct which fall within the statute of limitations were not sufficiently severe

or pervasive to create a hostile work environment. Thereafter, Western Union argues it is protected from

liability under the *Faragher/Ellerth* defense.

"To prevail on a hostile work environment . . . claim, the plaintiff must show that her work

environment was both subjectively and objectively hostile; that is, she must show that she perceived her

work environment to be hostile, and that a reasonable person in her position would perceive it to be so."

*Dominguez-Curry v. Nev. Transp. Dep't.*, 424 F.3d 1027, 1034 (9th Cir. 2005). A plaintiff can achieve

this by demonstrating: (1) she was "subject to verbal or physical conduct" because of her race or gender,

(2) "the conduct was unwelcome;" and (3) "the conduct was sufficiently severe or pervasive to alter the

conditions of the plaintiff's employment and create an abusive work environment." *Kang v. Bank of Am.,

NA*, 339 F.3d 792, 817 (9th Cir. 2002). To determine whether the workplace conditions meet the third

factor, courts typically consider the frequency of the conduct, the duration of the conduct, the objective

offensiveness of that conduct, whether the conduct was "physically threatening or humiliating," and whether

it "unreasonably interfered with" the plaintiff's work performance. *Id.*; *Nichols v. Azteca Rest. Enters.,

Inc.*, 256 F.3d 864, 872 (9th Cir. 2001).

\ \ \ \ \

Before filing a sexual harassment lawsuit under Title VII, a plaintiff must file a charge with the

relevant administrative agency within "300 days of any act that is part of the hostile work environment."

*Maliniak v. City of Tucson*, 607 Fed. Appx. 626, 627 (9th Cir. 2015) (mem.), *Nat'l R.R. Passenger*

*Corp. v. Morgan*, 536 U.S. 101, 115-16 (2002). For harassment claims brought under Oregon state statutes, the charge or case must be filed within one year of the alleged discriminatory statements or conduct. OR. REV. STAT. § 659A.875(1). In other Title VII claims, the court requires a charge to be filed within 300 days of each "discrete" discriminatory act giving rise to the discrimination. *Morgan*, 536 U.S. at 114. However, in *Morgan*, the Supreme Court recognized that the nature of the conduct at issue in a hostile work environment claim is different because it "occurs over a series of days or perhaps years and, in direct contrast to discreet acts, a single act of harassment may not be actionable on its own." *Id*. at 115. Therefore, hostile acts occurring outside the 300 day limitations period are still actionable if the prior acts are "related" to each other and whether they are both part the same pattern of harassment creating the hostile work environment. *Id*.; *Maliniak*, 607 Fed. Appx. at 628. Although courts are free to consider all the circumstances to determine whether acts are "related," courts in this circuit have considered "whether the earlier and later events amounted to 'the same type of employment actions, occurred relatively frequently, [or] were perpetrated by the same managers.'" *Id*.

      1. Race.

Redwind argues she was harassed by Chen, Acocelli, and Pinnegar based on her race and gender, creating a hostile work environment. Here, the court concludes that Chen's statements in August 2012 and the remaining conduct which gives rise to Redwind's harassment claim are not "related." Chen made comments in August 2012 that Redwind didn't "act Indian" and that India was not part of Asia, and made comments about the size and shape of Redwind's nose. These comments could be perceived by a reasonable individual as offensive racial remarks regarding Redwind's race, ethnicity, or national origin. However, Redwind filed her BOLI charge on March 15, 2015, and thus the statements and conduct by

Chen fall outside the statutes of limitations applicable to her claims. Therefore, Redwind can premise her claim on Chen's statements and conduct only if it is "related to" the conduct that fell within the limitations period.

The court concludes that Chen's statements are not "related" to the other statements and conduct upon which Redwind premises her claim. Redwind contends she was subject to a hostile work environment on the basis of race based on the comments in her semi-yearly evaluations, other statements made by her managers, and statements made by her fellow employees. All of these statements focus on Redwind's "interpersonal" and "communication" problems, as well as the fact that she is "too competitive." None of these statements could be reasonably perceived as targeting Redwind's race or being based on Redwind's race. Even if the court assumed that Chen's statements constituted offensive, racially hostile conduct, the comments by Pinnegar and Acocelli occurring within the limitations period are of a different nature. First, they were uttered by different individuals. Second, Pinnegar's and Acocelli's statements had nothing to do with Redwind's race or gender.

To the extent Redwind argues that these statements are related because they occurred in response to Redwind's "opposition" to Chen's Salesforce post which excluded Redwind from praise, the court disagrees. That connection is too tenuous to create the relationship necessary to show a continuous hostile work environment which allows an individual to sue based on conduct occurring before to the limitations period. Accordingly, the court concludes Redwind cannot rely on Chen's comments to prove her hostile work environment claim, and that the other statements and conduct at issue in this claim are not sufficiently severe and pervasive to constitute a hostile work environment based on race.

    2. Gender.

FINDINGS & RECOMMENDATION - 23                                             [RMD]

Redwind also contends she was subject to a hostile work environment on the basis of gender. In Redwind's response she argues Acocelli and Pinnegar told her she had "interaction problems," and "poor interpersonal skills." Redwind also testified at deposition that Pinnegar's statement that she is "too competitive" was based on her gender or sex. The court concludes these statements, alone or in conjunction, are not sufficiently severe or pervasive to constitute a hostile work environment because a reasonable person could not perceive these statements as being based on or because of Redwind's gender. None of these statements mentioned Redwind's gender tended to suggest she held these qualities because she is a woman, or tended to suggest that men did not possess these qualities. Moreover, Redwind does not contend that these occurred frequently enough or over a sufficient period of time to constitute a hostile work environment. Therefore, the court concludes summary judgment should be granted in Western Union's favor.

Because Redwind fails to establish she suffered conduct sufficiently severe and pervasive to constitute a hostile work environment, the court need not address whether Western Union is protected from liability under the *Faragher/Ellerth* defense.

*B. Discrimination*.

Redwind alleges she was subject to disparate treatment on the basis of her gender and race in violation of Title VII. Western Union argues Redwind's claims fail as a matter of law because some of her claims are barred by the statute of limitations. Further, it argues Redwind cannot prove a *prima facie* case of disparate treatment under Title VII because: (1) she was not subject to an adverse employment action; (2) she cannot identify similarly-situated individuals who were not subject to these adverse employment actions; and (3) Western Union took each action pursuant to a legitimate nondiscriminatory reason. To

narrow the scope of the court's analysis, the court will first discuss which of her claims are timely. The court will then address the merits of Redwind's disparate treatment claim.

        1.  Timeliness.

To assert a timely claim under Title VII, the complainant must file a charge with the EEOC within 300 days after the alleged unlawful practice occurred. *Morgan*, 536 U.S. at 109-111. Although Oregon law does not require a complainant to file an administrative charge, a civil claim under Oregon discrimination law "must be commenced within one year after the occurrence of the unlawful employment practice." OR. REV. STAT. § 659A.875. The Supreme Court has held that, for the purposes of a disparate treatment claim, "unlawful employment practice" means each "discrete act or single occurrence" of discrimination, "even when it has a connection to other acts." *Morgan*, 536 U.S. at 111 (internal quotation marks omitted). Thus, where a plaintiff is relying on adverse employment actions to prove disparate treatment, the plaintiff's claim is timely only if he or she files a charge within 300 days of the discreet act under federal law and one year under Oregon law.

Redwind filed her BOLI complaint on March 15, 2014, so her Title VII disparate treatment claim is timely only to the extent it relies upon discreet acts of discrimination which occurred on or after May 19, 2013. Her Oregon state claims are timely only to the extent they rely on discreet acts of discrimination which occurred on or after March 15, 2013.

The undisputed facts demonstrate that the following events occurred prior to May 19, 2013, and may not serve as a basis for Redwind's discrimination claim: (1) Judy Chen's comments to Redwind regarding "acting Indian," which occurred in August 2012; (2) Judy Chen's posting on Salesforce excluding Redwind from praise; (3) Redwind's alleged exclusion from the Seattle meeting in 2012 with Pinnegar and

other inner-mountain corridor employees; (4) Redwind's 2011 and 2012 year-end performance reviews; and (5) Eagle's closure of Redwind's March 19, 2013 ethics complaint, which Eagle closed in April 2013. However, due to the longer statute of limitations for cases brought under Oregon law, Redwind may rely on the fifth item, Eagle's closure of Redwind's March 2013 complaint, because it occurred during the one-year statute of limitations.

2.    Merits.

To prove a claim for discrimination, a plaintiff must offer direct or circumstantial evidence of the defendant's discriminatory purpose. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217 (9th Cir. 1998). "Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption." *Id.* (brackets omitted) (quoting *Davis v. Chevron, U.S.A., Inc.*, 14 F.3d 1082, 1085 (5th Cir. 1994)). Where a plaintiff can produce no direct evidence, the plaintiff may make her claim by introducing evidence to show: (1) she is a member of a protected class; (2) she was performing according to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) other similarly situated employees not in the protected class were treated more favorably. *Goodwin*, 150 F.3d at 1220. "[A]n adverse employment action is one that materially affects the terms, conditions, or privileges of the plaintiff's employment." *Ray v. Henderson*, 217 F.3d 1234, 1242 (9th Cir. 2000).

If a plaintiff meets her burden of establishing a *prima facie* case, the burden shifts to the defendant, who must produce a legitimate, nondiscriminatory reason for the adverse employment action. *Godwin*, 150 F.3d at 1220. Where the defendant successfully meets its burden on step two, the burden shifts back to the plaintiff to produce "specific substantial evidence" that defendant's proffered reason is "pretext." *Id.* at 1121. Courts analyze Oregon state discrimination claims under the same framework, so the court will

analyze Redwind's federal and state discrimination claims together. *Snead v. Metro. Prop & Cas. Ins. Co.*, 237 F.3d 1080, 1091-92 (9th Cir. 2001).

Redwind produces no direct evidence of discriminatory animus, so she must prove her case through circumstantial evidence and the three-step, burden shifting framework. Redwind cites eight adverse employment actions which give rise to her discrimination claim: (1) her exclusion from the 2012 meeting in Seattle with Pinnegar and others; (2) Pinnegar labeling Redwind "too competitive" during her 2012 year-end evaluation and citing her problems with "interpersonal skills;" (3) Pinnegar's and Acocelli's continued critique of Redwind as having "interaction problems;" (4) Pinnegar awarding the 2013 Outstanding Achievement award to Watts instead of Redwind; (5) giving another employee a higher merit increase in 2013; (6) Pinnegar giving Redwind a "1" rating in the "Net-Neutral Count" category for her 2014 year-end evaluation; (7) Hiring Redwind at a salary "below the company's minimum standards;" and (8) giving Redwind a "low" rating for Redwind's 2013 year-end review. (Resp. at 25-30.) The court already has concluded Redwind's federal claims are time-barred to the extent they are based on conduct occurring before May 19, 2013, so her claims based on the first, second, and seventh alleged adverse employment actions are time-barred. The court will now consider the merits of Redwind's claims based on the remaining actions.

### a. Critiques of Redwind's Interpersonal Skills

Redwind contends that she was subject to an adverse employment action because Pinnegar and Acocelli told her she was "too competitive," and had "poor interpersonal and judgment skills." Standing alone, these statements would not constitute an adverse employment action, as Redwind fails to

demonstrate how the mere utterance of these performance critiques affect the "terms and conditions" of her employment. The comments were all work-related and are not objectively offensive.

Redwind does not raise the argument, but these statements may constitute an adverse employment action when they appear in the "coaching memorandum." The coaching memorandum, which Acocelli gave to Redwind on August 13, 2013, could reasonably be viewed as a form of discipline. The Western Union Code of Conduct identifies "counseling," which is reasonably viewed as a synonym for "coaching," as a method of discipline Western Union may impose for violations of rules and policies. (Redwind Decl. Ex. 4 at 50.) Courts typically find workplace discipline, including "warning letters" to constitute adverse employment actions. *Fonseca v. Sysco Food Servs of Ariz., Inc.*, 374 F.3d 840, 848 (9th Cir. 2004). Therefore, the coaching memorandum may serve as an adverse employment action.

However, Redwind fails to show that she was performing her job according to her employer's legitimate expectations in regards to her interpersonal and communication skills. In the coaching memorandum, Acocelli cites at least five instances where Redwind exhibited poor judgment or poor interpersonal skills. Redwind does not now, and has never, questioned the factual truth of the events underlying the Coaching Memorandum. She takes issue only with Acocelli's interpretation of those events and the conclusions he reaches. Because Redwind does not show she performed her job according to Western Union's reasonable expectations in regards to communication skills, interpersonal skills, and professional judgment, Redwind cannot make out a *prima facie* case based on the Coaching Memorandum.

Even if Redwind were able to make out a *prima facie* case based on the coaching memorandum, Western Union contends it issued the memorandum for the legitimate nondiscriminatory reason that it felt

obliged to help Redwind improve on her weaknesses and to promote workplace harmony. Western Union's justification for issuing the memorandum and otherwise critiquing Redwind's communication and interpersonal skills has been consistent since the critiques were issued.

Redwind attempts to show pretext by arguing that another employee, Stacy Blake, was praised for her interaction and communication skills, despite sending an email that showed competitiveness and hostility toward Redwind. The court disagrees that this, without more, is "specific substantial" evidence of pretext. After Blake and her team came up with a new marketing idea, Blake wrote to the entire team, including Pinnegar and Acocelli, "Take that Sandeep! Nothing wrong with some friendly AE competition. She will one up us soon because she is our marketing goddess!" (Redwind Dec. Ex. 49 at 1.) Thereafter, Pinnegar gave Blake a rating of "exceeds expectations" in the "connectedness" category of her 2013 year-end review and praised Blake's communication skills. (Redwind Decl. Ex. 50 at 1.) He wrote that Blake "has always exceeded my expectations with WU behaviour and it is greatly appreciated." (*Id.*).

This evidence fails to show pretext for two reasons. First, Blake's email is not truly competitive or hostile toward Redwind. It specifically states that the statement was made in a "friendly" manner, and the email ends with high praise for Redwind's skill as Western Union's "marketing goddess." Second, Redwind fails to show that Blake had a pattern of disagreements and misunderstandings with her coworkers and managers. Because Redwind cannot produce specific substantial evidence of pretext, Western Union is entitled to summary judgment on this claim.

b. The 2013 Outstanding Achievement Award.

Redwind contends that Pinnegar's decision to award the 2013 Outstanding Achievement Award to Watts, as opposed to Redwind, was an adverse employment action. The court disagrees. Redwind

cites no authority for the proposition that a manager's decision to give an award to plaintiff's co-worker instead of the plaintiff constitutes and averse employment action. Redwind experienced no change in the terms and conditions of her employment. Moreover, Redwind's contention that Pinnegar's decision was based on racial animus is undermined by the fact that Pinnegar gave the award to Redwind in 2012. Therefore, Western Union is entitled to summary judgment on this claim.

                c.  Merit Increases.

Redwind argues that her merit increase awarded during the 2013 year-end review amounted to an adverse employment action. The court disagrees. During the 2013 year-end reviews, Pinnegar awarded an increase in pay for each of his subordinates based on their respective performance. Pinnegar awarded Redwind a merit-pay increase of 4%. This was the second-highest increase Pinnegar awarded. The only increase which was higher was for another employee, Rocio Vasquez, who received a 5% merit increase. The merit increases for the six other employees receiving one ranged from 2.1% to 3%.

Redwind fails to demonstrate that receiving the second highest merit increase among her peers changed the terms or conditions of her employment in an adverse way. She does not introduce evidence that she was entitled to receive the highest merit-pay increase under her contract. Nor does she prove Pinnegar violated Western Union policies by awarding Vasquez a higher merit increase.

Even if Redwind proved the merit-pay increase was an adverse employment action, Western Union produces a legitimate nondiscriminatory reason for Pinnegar's decision: to bring Vasquez's salary in line with other Account Executive MTs. Pinnegar testified in his Declaration that he has a limited budget to award for merit-pay increases, and that giving an increase to one person necessarily precludes him from giving that increase to another. (Pinnegar Decl. ¶ 6.) He further testified that he "approved the highest

FINDINGS & RECOMMENDATION - 30                                     [RMD]

percent merit increase for Ms. Vasquez to bring her base salary more in line with the other Account

Executive-MTs on the team since she was at the time the lowest paid" individual on the team. (Pinnegar

Decl. ¶ 26.) This legitimate nondiscriminatory reason is further supported by the fact that, even after he

applied the merit increases, Vasquez's salary was still less than Redwind's. (Pinnegar Decl. ¶ 26.)

Redwind fails to meet her burden of citing "specific substantial evidence" to demonstrate pretext.

Therefore, the court should grant Western Union summary judgment on this claim.

### d. Year-End Reviews.

Redwind contends that she was subject to an adverse employment action when Pinnegar gave her

a "low" rating on her 2013 year-end review. The court disagrees. Pinnegar gave Redwind an overall rating

of four out of five, or "exceeds expectations" for her 2013 year end performance review. This was the

highest rating given to any Account Executive MT under Pinnegar's management, and Pinnegar testified

that he has never given an overall rating higher than "exceeds expectations" on a performance review.

(Pinnegar Decl. ¶ 8.)

Redwind also contends she was subject to an adverse employment action when Pinnegar gave her

a "1" rating on one category as part of her 2014 year-end performance review. On that review, Pinnegar

rated Redwind 4 out of 5 or "exceeds expectations" overall, but rated Redwind a 1 out of 5 in the category

of "Net Neutral Agent Count" because she did not meet the expectations set for her at the beginning of the

reporting period.

In *Cozzi v. County of Marin*, No. C 08-3633 PJH, 2010 WL 1532359 (N.D. Cal April 16,

2010), a court in the Northern District of California faced nearly identical facts. There, the plaintiff filed

suit for discrimination based on gender, and claimed she was subject to an adverse employment action

when her supervisor gave her an overall rating of 3 out of 5, or "meets standards." *Id*. at 1. However, the manager rated the plaintiff as "needs improvement" in one of the twenty sub-categories considered in the evaluation. *Id*. The court concluded the evaluation was not an adverse employment action:

> The court finds, however, that the 2006 performance review was largely positive, as Grigsby's overall rating was "meets standards." According to the defendants' undisputed evidence, the "meets standards" designation qualifies a County employee for all potential raises, and is recognition that an employee is doing what the standards of the job require. Thus, even if the one sub-part that indicated "needs improvement" can be construed as "negative," the performance evaluation as a whole does not meet the definition of a negative employment action, because there is no evidence that the evaluation led to an alteration in the terms and conditions of plaintiff's employment, or to any tangible form of adverse action

*Id*. at *7.

The court agrees with the reasoning expressed in *Cozzi* and concludes Redwind's claims based on the 2013 and 2014 year-end performance reviews fail as a matter of law. Redwind produces no evidence that failing to receive a perfect performance rating, despite receiving the highest rating among her peers, altered the terms or conditions of her employment. Her performance ratings were consistently positive, and as a result she was compensated better than nearly all her peers. Accordingly, Redwind fails to demonstrate a *prima facie* case of discrimination based on her 2013 and 2014 year-end performance reviews.

### e. The Warning.

Although Redwind does not specifically cite the Warning as an adverse employment action in her brief, Redwind discusses the Warning in her complaint and alleges is it was retaliatory and discriminatory. Therefore, the court will review her claim to the extent it relies on the Warning. Western Union argues

Redwind cannot make a *prima facie* showing based on the warning because Redwind did not meet Western Union's legitimate expectations for her conduct, the Warning was not adverse, and Redwind cannot show a similarly-situated individual outside her protected class was given more favorable treatment. It also argues that, even if Redwind can establish a *prima facie* case of discrimination base on the Warning, it issued the Warning for a legitimate, nondiscriminatory reason.

Western Union is incorrect that the Warning does not constitute an adverse employment action. Western Union's Code of Conduct identifies a warning as one of several means of discipline Western Union may take if its policies are violated. (Redwind Decl. Ex. 4 at 50.) Courts have repeatedly held that disciplinary actions constitute adverse employment actions. *Fonseca*, , 374 F.3d at 848. However, Redwind fails to establish the elements of her *prima facie* case. First, Redwind failed to demonstrate she met Western Union's legitimate expectations regarding her performance. She produces no evidence, and does not argue, that she was in compliance with Western Union's intellectual property and antitrust policies. Moreover, Redwind fails to identify similarly-situated employees who received more favorable treatment because she does not identify any Western Union employee who was accused of violating Western Union intellectual property and antitrust policies. Because she fails to prove two elements of her *prima facie* case, Western Union is entitled to summary judgment.

Even if Redwind was able to make out a *prima facie* case, Western Union argues that it issued the Warning for the legitimate nondiscriminatory reason of ensuring Redwind was aware she had violated Western Union policies and to convince Redwind to refrain from further policy violations in the future. This legitimate, nondiscriminatory reason has remained consistent since the Warning was issued. Redwind fails to produce "specific substantial" evidence tending to show discriminatory animus was the actual motive

behind issuing the Warning, or even that it was a motivating factor behind Western Union's decision to issue

the Warning. Because Redwind's claim fails at step one and step three of the burden shifting framework,

the court should grant summary judgment in Western Union's favor on this claim.

f. The Investigations.

Again, Redwind does not specifically cite the allegedly "insufficient" investigations conducted by

Eagle and McCarty as adverse employment actions. However, Western Union argues Redwind cannot

prove her discrimination claims based on the investigations. The court agrees. Redwind has the burden

of demonstrating she was subject to an adverse employment action. Therefore, she has a duty to produce

facts which show a particular action negatively affected the "terms and conditions" of her employment. For

her claim premised on the investigations, this necessarily requires Redwind to produce some evidence

which tends to prove the primary premise of her argument: that the investigations were conducted in a

manner which fell below what is usually applied to Western union ethics investigations. Redwind fails to

carry her burden in two ways. First, she fails to produce evidence showing the typical investigatory

procedures applied to ethics investigations or required by Western Union policies. Second, she fails to

produce evidence showing what investigatory procedures Western Union actually applied to her case, or

that those procedures fell below those required by the law and Western Union policy. Therefore, Western

Union is entitled to summary judgment on this claim

C. Retaliation.

Redwind contends she was subject to retaliation for opposing Western Union's allegedly

discriminatory practices. Western Union moves for summary judgment on Redwind's retaliation claims and

argues: (1) Redwind cannot establish she suffered an adverse employment action; (2) she cannot establish

the causal element of her claim; and (3) even if she establishes her *prima facie* case, Western Union has legitimate nondiscriminatory reasons for each action.

To establish a *prima facie* case for retaliation under Title VII, the plaintiff must show: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal relationship exists between the two. *Brooks v. City of San Mateo*, 299 F.3d 917, 928 (9th Cir. 2000). For a retaliation claim, courts define adverse employment action as an action which is "reasonably likely to deter the charging party or others from engaging in protected activity." *Ray*, 217 F.3d at 1243-44. To establish causation, a plaintiff must show "by a preponderance of the evidence that engaging in the protected activity was one of the reasons for [the adverse employment action] and that but for such activity he would not have been fired." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064-65 (9th Cir. 2002) (quoting *Ruggles v. Cal. Polytechnic State Univ.*, 797 F.2d 782, 785 (9th Cir. 1986). Where a plaintiff proves the three elements of a prima facie case, the court applies the same burden-shifting analysis applicable to discrimination claims, whereby defendants must show they took the adverse employment action for a legitimate nondiscriminatory reason, at which time the burden shifts back to the plaintiff to demonstrate pretext.

Because the court concluded *supra* that some of Western Union's actions do not constitute adverse employment actions for purposes of a discrimination claim, the court will address the preliminary issue of whether those qualify as adverse employment actions under the test applicable to retaliation claims. Thereafter, the court will determine if any of Redwind's retaliation claims survive summary judgment.

    1.  Adverse Employment Actions.

In support for her retaliation claim, Redwind cites the same adverse employment actions she cited to support her discrimination claim. The court has already concluded that her claims based on being hired at a salary below the pay scale and her exclusion from the 2012 Seattle meeting are time-barred. Because the same statute of limitations applies to retaliation claims, Redwind's claims based on those allegedly adverse employment actions are time-barred.

The court also concludes Redwind cannot rely on the following actions to prove her claim for retaliation based on: (1) Pinnegar's and Acocelli's critiques of Redwind's communication and interpersonal skills, with the exception of those included in the coaching memorandum; (2) the outstanding achievement award; (3) Redwind's merit-pay increases; (4) Redwind's performance reviews; and (5) the investigations.

First, although the Coaching Memorandum is a form of discipline and thus constitutes an adverse employment action, Acocelli's and Pinnegar's statements to Redwind regarding her communication and interpersonal problems are not an adverse employment action. It is clear that Redwind took offense to them, but they would not have dissuaded a person of reasonable firmness from pursuing his or her rights by reporting abuses through official channels. In reaching this conclusion, the court is particularly persuaded by the fact that the statements were not an unprompted attack on Redwind's character intended to hurt or offend Redwind. Instead, Pinnegar, and later Acocelli, offered these critiques only after Redwind asked Pinnegar how she could achieve a higher rating on her performance evaluations. Pinnegar responded to Redwind's request by identifying the areas in which she could improve her work performance. Thus, the court concludes that a reasonable person would not be dissuaded from engaging in protected activity after receiving these critiques which that person requested.

Second, the court concludes a reasonable person would not be dissuaded from engaging in protected activity upon not receiving the 2013 Outstanding Achievement Award. The record demonstrates that the award was given to only one employee under Pinnegar's management each year. Moreover, Pinnegar gave the award to Redwind the previous year and did not promise that she would receive it again. A reasonable person would not be dissuaded from engaging in protected action after not receiving the award a second consecutive year. Because only one employee per year can receive the award, a non-recipient's career or standing with the organization would not be harmed or otherwise affected. Therefore, not receiving the Outstanding Achievement Award is not an adverse employment action for the purposes of Redwind's retaliation claims.

Third, the court concludes that Pinnegar's decision to award Vasquez a higher merit-pay increase than Redwind is not an adverse employment action. Redwind received the second-highest merit pay increase of any Account Executive MT under Pinnegar's management. Redwind received a four percent increase, while Vasquez received a five-percent increase. A reasonable person who received the second highest merit-pay increase among those similarly situated would not be dissuaded from engaging in further protected activity. That reasonable person would see the merit-pay increase as indicative of the significant value he or she brings to the work group. Therefore, Pinnegar did not take an adverse employment action when he awarded Redwind the second-highest merit-pay increase during the 2013 year-end reviews.

Fourth, Redwind cannot premise her retaliation claim on her mid-year or year-end performance reviews because she received a four-out-of-five, or "exceeds expectations" rating. Pinnegar testified he has never rated an employee higher than "exceeds expectations," and given Western Union's five-point evaluation scale where five is the highest rating, a reasonable individual would view a four-out-of-five rating

as a positive. That largely positive rating would not dissuade a reasonable individual from engaging in further protected activity. Therefore, Redwind's performance evaluations are not adverse employment actions which may form the basis of a retaliation claim.

Fifth and finally, Redwind cannot pursue her retaliation claim based on the investigations. Redwind has failed to produce evidence showing: (1) the typical procedures Western Union employees take to investigate ethics complaints; and (2) that the procedures employed to investigate Redwind's five ethics complaints fell short of that standard. She merely argues in conclusory fashion that the investigations were insufficient. Because she fails to meet her burden of proving the truth of the primary premise upon which her "investigation claims" are based, the court concludes she cannot demonstrate the investigations were adverse employment actions.

\ \ \ \ \

\ \ \ \ \

However, the Coaching Memorandum and the Warning both constitute disciplinary actions, which courts have consistently held to constitute adverse employment actions. Therefore, the court will now consider the merits of Redwind's retaliation claims based those two disciplinary actions.

1.  The Coaching Memorandum.

The coaching memorandum constitutes an adverse employment action, and Western Union assumes, without conceding, that Redwind engaged in protected activity "by complaining about her supervisors and manager." (Mot. for Summary Judgment at 30.) However, Western Union contends Redwind cannot establish causation or pretext.

"[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo*, 281 F.3d at 1065; *see also Miller v. Fairchild Indus.*, 885 F.2d 498, 505 (9th Cir.1989) (*prima facie* case established where adverse action taken forty-two and fifty-nine days after protected action); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (*prima facie* case established where adverse action taken three months after complaint filed, two months after charge first investigated, and less than two months after investigation completed). However, the Supreme Court has concluded that, in the absence of other evidence, "the temporal proximity must be 'very close'" to establish an inference of causation. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citing *O'Neal v. Ferguson Constr. Co*, 237 F.3d 1248, 1253 (10th Cir. 2001); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (finding a three-month time lapse to be insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (finding a four-month period insufficient)); *see also Adusumilli v. City of Chicago*, 164 F.3d 353, 363 (7th Cir. 1998) (cited favorably by *Villiarimo*, 281 F.3d at 1065) (eight months too long to create an inference of causation); *Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 511 (7th Cir. 1998) (cited favorably by *Villiarimo*, 281 F.3d at 1065) (five months too long); *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (cited favorably by *Villiarimo*, 281 F.3d at 1065) (four months too long). Courts have found temporal proximity to be a particularly unconvincing means of proving causation where the employer's rationale underlying the adverse action or plan to undertake the adverse action predates the plaintiff's protected activity. *See Breeden*, 532 U.S. at 272 (finding no inference of causation where the employer planned to transfer the plaintiff before she engaged in protected activity, but transferred her after the protected activity occurred).

Here, Redwind does not meet her burden of showing a causal relationship between the Coaching Memorandum and her protected activity. Redwind filed her first ethics complaint against Pinnegar and Acocelli on March 9, 2013. (McCarty Decl. ¶ 4.) Engle investigated the complaint and concluded no laws or Western Union policies were violated. (McCarty Decl. Ex. 2.) This conclusion was communicated to Redwind on March 25, 2015, via email. (TAC Ex. 1 at 21.) On August 13, 2013, more than five months after Redwind filed her March 9, 2013 ethics complaint, Acocelli gave Redwind the Coaching Memorandum. (Acocelli Decl. Ex. 5.) More than five months, without additional evidence, is not sufficient temporal proximity to demonstrate causation. Moreover, Acocelli and Pinnegar expressed their concerns about Redwind's communication and interpersonal skills before Redwind filed her first ethics complaint, further weakening the causal inference Redwind asks the court to make. Because Redwind cannot prove a causal connection between the first ethics complaint and the Coaching Memorandum, the court should grant Western Union summary judgment on this claim.

\ \ \ \ \

2.  The Warning.

Redwind next contends that the Warning was retaliation for Redwind's BOLI complaint.  Redwind filed her BOLI complaint on March 15, 2014.  (Crespo Decl. Ex. 6.)  BOLI completed its investigation and dismissed Redwind's charge on September 3, 2014.  (TAC Ex. 22.)  Pinnegar issued Redwind the Warning on October 1, 2014.  (Pinnegar Decl. Ex. 7.)  Therefore, the Warning was issued six and a half months after Redwind filed her BOLI complaint and just under one month after BOLI closed her case.

Redwind fails to establish a causal connection between the BOLI complaint and the Warning, as the Warning was issued roughly seven months after she filed her BOLI complaint.  Moreover, even if the temporal proximity between the Warning and the BOLI complaint demonstrated causation, Western Union has shown a legitimate nondiscriminatory reason for issuing Redwind the Warning – to notify her that her Salesforce posts violated Western Union's antitrust and intellectual property policies.  Redwind fails to meet her burden thereafter of offering "specific substantial" evidence of pretext.  Therefore, Defendants are entitled to summary judgment on Redwind's retaliation claim based on the Warning.

IV.  Damages.

Because the court has concluded none of Redwind's claims survive summary judgment, it need not address Western Union's remaining argument that Redwind cannot prove her claim for damages.

*Conclusion*

For the aforementioned reasons, Western Union's Motion for Summary Judgment (ECF No. 95) should be GRANTED in full, and Redwind's case should be dismissed with prejudice.

*Scheduling Order*

FINDINGS & RECOMMENDATION - 41                    [RMD]

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due May 19th, 2016, if no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

DATED this 2nd day of May, 2016.

_____/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge
